IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG DIVISION


COOKE & MOSES, LLC,
ROY COOKE AND JEFFREY MOSES

     Plaintiffs,


                            CIVIL ACTION NO. 1:06-CV-147
v.                           (Judge Keeley)


QSS-ENGINEERED SYSTEMS GROUP, LLC,
d/b/a Deligo Technologies, a Michigan
Limited Liability Company,
QUALITY SOFTWARE SOLUTIONS, INC.,
a Michigan Corporation, d/b/a
QSSOLUTIONS, INC., THOMAS KELLY,
DAVID H. MARSH, ARTHUR C. CARLUCCI,
DENNIS MOORE, DEMO A. STAVROS,
ROBERT WIDMAN, ROBERT ZEINSTRA,
and JOHN DOES 1-10

     Defendants.


## MEMORANDUM OPINION AND ORDER DENYING-IN-PART AND GRANTING-IN-PART DEFENDANTS' MOTION TO DISMISS

This matter is before the Court on the defendants' motion to dismiss. The plaintiffs allege that they executed a $750,000 line of credit on behalf of Defendant QSS-Engineered Systems Group, LLC, ("QSS") and that QSS-Software Solutions Group, Inc. ("QSS-ESG") later defaulted on its financial obligation. Further, they allege that the defendants obtained the funds through fraudulent schemes and misrepresentations.

COOKE & MOSES, LLC, ET AL.
v.
QSS-ENGINEERED SYSTEMS GROUP, LLC, ET. AL.
1:06CV147

## MEMORANDUM OPINION AND ORDER

On September 29, 2006, the plaintiffs sued both QSS and QSS-ESG, and their individual officers and agents in this Court. In their complaint, the plaintiffs allege that the defendants engaged in a scheme to defraud that violated the Racketeer Influenced and Corrupt Organizations ("RICO") statute. They also allege claims for fraud, civil conspiracy, breach of contract, breach of guaranty and surety agreement, corporate veil piercing, and several alternative claims.

After the plaintiffs amended their complaint to add certain factual allegations, the defendants moved to dismiss all counts. In their supporting memorandum, they contended that "[t]he cornerstone of the Amended Complaint is an allegation of fraud which is patently frivolous." (Defs.' Memo, p. 1). The factual allegation that the defendants specifically contested was that they had failed to disclose a business relationship concerning their joint ownership of technology called the Iced*CAD software with an India-based company named Purma Global Infotech, LTC. ("PGI"). The defendants asserted that they had fully disclosed this relationship in an e-mail sent to the plaintiffs in March, 2004. Further, the

## MEMORANDUM OPINION AND ORDER

defendants contended that "[e]very Count is contingent and dependent upon this frivolous allegation . . . ." (Id. at p. 2).

Following the filing of this motion, the plaintiffs filed both a response to the motion and also a motion for leave to again amend their complaint. In their response, they conceded that the defendants had informed them of a joint ownership agreement with PGI concerning the Iced*CAD software, but stated that they had failed to recollect the relevant e-mail communication when they filed the amended complaint. They contended, however, that the e-mail contained only "one fact related to one of the fraud claims," and that "it does not address the other distinct fraud claims, nor does it impact the civil conspiracy, negligent misrepresentation, breach of contract, guaranty, or RICO claims." (Pls.' Reply, pp. 4, 6). The plaintiffs further stated that the purpose of their motion to amend was to clarify the issues in dispute and correct errors concerning their early knowledge about PGI's joint ownership of the Iced*CAD software, but not to add additional theories of liability.

The defendants then filed a motion in which they conceded that the plaintiffs' motion to amend did not add any new causes of

## MEMORANDUM OPINION AND ORDER

action, but argued that, if the Court granted the plaintiffs' motion, the amended factual allegations would moot their motion to dismiss and require them to file an amended motion to dismiss. Later, they responded to the plaintiffs' motion to amend, arguing that the plaintiffs' attempt to amend their complaint a second time "should be denied as futile and made in bad faith." They claimed that the "proposed amendments neither change the causes of action alleged . . . nor add anything of value . . .," and that they would only make the litigation more costly. The Court granted the plaintiffs' motion to amend their complaint, finding that the motion was not frivolous and that the defendants would not be prejudiced by the amendments.

As in the earlier versions of their complaint, the plaintiffs' second amended complaint sets forth distinct fraud claims, as well as claims for a violation of RICO, civil conspiracy, breach of contract, breach of the loan guaranty agreement, corporate veil piercing and other alternative claims. For the reasons that follow, the Court **DENIES-IN-PART** and **GRANTS-IN-PART** the defendants' motion to dismiss this second amended complaint. Specifically, the Court:

COOKE & MOSES, LLC, ET AL.
v.
QSS-ENGINEERED SYSTEMS GROUP, LLC, ET. AL.
1:06CV147

## MEMORANDUM OPINION AND ORDER

(1) **DENIES-IN-PART** and **GRANTS-IN-PART** the defendants' motion to dismiss the plaintiffs' RICO claims;

(2) **DENIES-IN-PART** and **GRANTS-IN-PART** the defendants' motion to dismiss each of the plaintiffs' four distinct fraud claims;

(3) **DENIES** the defendants' motion to dismiss the civil conspiracy claim;

(4) **DENIES** the defendants' motion to dismiss the breach of contract claim;

(5) **DENIES** the defendants' motion to dismiss the breach of loan guaranty claim;

(6) **DENIES-IN-PART** and **GRANTS-IN-PART** the defendants' motion to dismiss the corporate veil piercing claim.

## I. Factual and Procedural History

On May 1, 2000, QSS incorporated in Michigan and then merged with the Delaware-based QSS. Defendants Robert Zeinstra ("Zeinstra"), Demo A. Stavros ("Stravros"), Thomas Kelly ("Kelly"), Dennis Moore ("Moore") and Robert Widman ("Widman") owned Defendant QSS. QSS owned software technology known as Iced*CAD, which

COOKE & MOSES, LLC, ET AL.
v.
QSS-ENGINEERED SYSTEMS GROUP, LLC, ET. AL.
1:06CV147

## MEMORANDUM OPINION AND ORDER

Defendants Arthur Carlucci ("Carlucci"), Kelly and two others invented and designed. According to the defendants, the Iced*CAD software "creates custom product designs and accurate documentation, including engineering drawings, from bills of material stored in the client's own computer." (Defs.' Memo In Supp. of Mot. to Dismiss, p.2) (hereinafter "Defs.' Memo").

On August 22, 2002, QSS entered into a Joint Ownership, Development, and Marketing Agreement (the "Joint Ownership Agreement") with the India-based company, PGI, to further develop and market the Iced*CAD software. The Joint Ownership Agreement was binding on both QSS and PGI, and designated each as owners of the "Joint Technology." The companies then filed a patent application with the United States Patent Office that listed the assignees of the intellectual property as QSS and PGI.

In January, 2003, defendant QSS-ESG was created to focus solely on developing and marketing the Iced*CAD software. The founding members of QSS-ESG were Zeinstra, Stavros, Kelly, Moore and Widman, and Carlucci and Marsh were its employees. QSS-ESG hoped to develop and market the Iced*CAD software even further by increasing its emphasis on promotion, and by offering the product

6

## MEMORANDUM OPINION AND ORDER

in a "shrink wrap software" version. (Defs.' Memo, p. 3). QSS-ESG, thus, sought $1,500,000 in additional capital and began working with an advertising consultant, Marsh, who approached the plaintiffs, Cooke and Moses, to discuss a potential investment opportunity.

After several telephone conferences with Marsh, Cooke and Moses eventually met with Marsh and Kelly in person to discuss the investment opportunity in Iced*CAD. Kelly prepared an informational document entitled "QSS-Engineered Systems Group, LLC Business Plan Version 3.0" ("Business Plan") to provide the plaintiffs with an overview of QSS-ESG and its Iced*CAD software. Cooke and Moses now dispute the following statements contained in that Business Plan:

> A. Iced*CAD has been successfully implemented at a large multinational manufacturer;
>
> B. QSS-ESG has quickly established Iced*CAD as an industry-leading software package in the emerging high-growth software segment known as cPDm, or collaborative product data management;
>
> C. We own our intellectual property. Patent-pending on Iced*CAD;
>
> D. Multiple opportunities for revenue creation exist including: license revenue, services

revenue, hosting services, and franchise/reseller fees. QSS-ESG will see a dramatic inflection point of growth at the launching of our shrinkwrap software product to be sold through resellers in 2005; and

E. While our fully-developed software is award-winning, installed and proven in the market, and we are profitable, QSS-ESG does not generate enough free cashflow to aggressively grow the business, hence our efforts to raise outside capital.

(Pls.' Second Am. Compl. ¶ 16) (hereinafter "Compl.").

In early 2004, Cooke and Michael Hundall, President of Freedom Bancshares Inc. ("Freedom Bank"), traveled to QSS-ESG's offices in Michigan where Kelly showed a power-point presentation allegedly representing that QSS-ESG was "clean" with "no debt and no royalties," and that Iced*CAD was "fully developed" and "launched." (Compl. ¶ 31). In the following months, the parties communicated via e-mail and telephone concerning the plaintiffs' potential investment, the future structure of QSS-ESG and the "intellectual property strategy going forward." (Defs.' Memo, pp. 3-4). In their second amended complaint, the plaintiffs allege that Kelly and Marsh made the following representations during the course of these communications:

MEMORANDUM OPINION AND ORDER

A. That QSG-ESG either owned the intellectual property underlying the Iced*CAD software or that it would own the intellectual property underlying the Iced*CAD software through assignment of the intellectual property, prior to any investment by Cooke, Moses, & C&M;

B. That QSS-ESG was or would be in a position to pledge the support of intellectual property underlying the Iced*CAD software to secure its obligations, in the event an individual or entity was willing to invest sums in QSS-ESG and/or guarantee the loan of sums to QSS-ESG;

C. That Iced*CAD had been successfully implemented at a large multinational manufacturer; and

D. That Iced*CAD was a functional and saleable product and that funds secured through investment or other means would be used primarily for marketing and "ramp up."

(Compl. ¶ 32).

On March 9, 2004, Cooke and Moses sent Kelly a "Letter of Understanding" in which they outlined an initial proposal to provide funding to QSS-ESG through a line of credit. Cooke and Moses then formed plaintiff Cooke & Moses, LLC ("C&M") on June 10, 2004 as a primary vehicle through which to invest in QSS-ESG.

In June, 2004, a "Patent Application Assignment" agreement was written (the "Patent Agreement"), which purported to transfer the Iced*CAD software and related intellectual property from QSS to

MEMORANDUM OPINION AND ORDER

QSS-ESG. The Patent Agreement stated that QSS "DOES HEREBY assign and transfer to Assignee all right, title and interest in and to the Patent Rights," and that QSS "represents and warrants that no assignments, sale, interest, license, agreement, security interest, or any other form of encumbrance has been made or entered into which would conflict with this assignment." (Compl. ¶ 34 Ex. B). The plaintiffs allege that not only were these statements false, but that, despite Kelly's contrary assurances, the Patent Agreement was never executed.

The plaintiffs also allege that Kelly forwarded to Mr. Hundall "Business Plan Version 4.0," which contained the same disputed statements found in the original Business Plan, and which "deleted references to PGI." (Compl. ¶ 40). They contend that, on June 23, 2004, Mr. Hundall mailed this document to several parties, including the Board Members of Freedom Bank. Subsequently, on July 13, 2004, QSS-ESG and C&M signed a note with Freedom Bank for $750,000. Kelly, acting on behalf of QSS-ESG, then signed a Commercial Security Agreement purporting to secure the note by providing a security interest to Freedom Bank in the form of, among other things,

10

MEMORANDUM OPINION AND ORDER

> debtors patented (pending) proprietary
> computer software program identified as
> Iced*CAD, and including all related
> intellectual property rights in said software
> and improvements and accounts receivable or
> generated with respect to said property.

(Id. at ¶ 46).

Cooke and Moses also allege that Marsh and Kelly represented that they would pledge their homes as collateral, and would personally guarantee the note. The plaintiffs contend that the defendants made these assurances prior to the close of the business deal on July 13, 2004, but did not, and never intended to, follow through.

By the Fall of 2005, the plaintiffs had grown concerned about Iced*CAD's lack of progress and QSS-ESG's rising expenditures. After Kelly resigned as President of QSS-ESG, C&M began to review QSS-ESG's books. An initial fund disbursement of $203,909.89 had been made to QSS-ESG on July 13, 2004, and seven additional disbursements had occurred between September, 2004 and June, 2005. The plaintiffs state that, pursuant to the parties' agreement, QSS-ESG was to use these funds for marketing efforts. They claim, however, that during the disbursement period the defendants directed numerous international wire transfers in excess of $85,000

11

## MEMORANDUM OPINION AND ORDER

to India. They further allege that QSS-ESG sent these funds to PGI, and that the transfers either fulfilled past debt obligations or paid for software services, and that the defendants used the funds to pay other debts incurred both by QSS-ESG and QSS. The plaintiffs claim that Carlucci has acknowledged that the plaintiffs had been "scammed." (Compl. ¶ 63).

The plaintiffs state that, ultimately, QSS-ESG defaulted on its obligations under the note. C&M then purchased the note from Freedom Bank, and, as of May 18, 2006, the note's balance was $655,691.55 plus $6,529.16 in accrued, unpaid interest. (Compl. ¶ 65). The plaintiffs claim that they are damaged in this amount, plus interests, costs and attorneys' fees.

They further allege that, "[b]ut for the fraudulent misrepresentations regarding the ownership of the Iced*CAD software and its stage of development, they would not have entered into the business transaction described herein and would not have acted as a co-maker on the note or guaranteed the Note." (Compl. ¶ 9). They claim that the defendants enticed them to invest money in QSS-ESG through a scheme to defraud, and that Kelly, Marsh, Carlucci, Zeinstra, Stravos, Widman and Moore, "through the operation and

## MEMORANDUM OPINION AND ORDER

control of QSS and QSS-ESG, . . . obtain[ed] money and funds for their own individual benefit." (Id. at ¶ 67).

## II. **Standard of Review**

The defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) asserts that the plaintiffs' second amended complaint fails to state a claim upon which relief can be granted. The purpose of Fed.R.Civ.P 12(b)(6) is to test the legal sufficiency of the complaint. Randall v. U.S., 30 F.3d 518, 522 (4th Cir. 1994)(citing Schatz v. Rosenberg, 943 F.2d 485, 489 (4th Cir. 1991)). The legal conclusions in the complaint must be accompanied by factual allegations sufficient to support them. Migdal v. Rowe Price-Fleming Int'l, Inc., 248 F.3d 321, 326 (4th Cir. 2001).

Moreover, when evaluating the sufficiency of those allegations, courts must accept as true all well-pleaded factual allegations in the complaint and construe them in the light most favorable to the plaintiffs. Mylan Lab., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). Further, a court may dismiss a complaint under Rule 12(b)(6) "only if it is clear that no relief could be granted under any set of facts that could be proved

13

COOKE & MOSES, LLC, ET AL.
v.
QSS-ENGINEERED SYSTEMS GROUP, LLC, ET. AL.
1:06CV147

## MEMORANDUM OPINION AND ORDER

consistent with the allegations." <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73 (1984).

The defendants also have asserted that the plaintiffs' claims are frivolous, and that they have failed to state a claim over which this Court has subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). When a defendant files a 12(b)(1) motion to dismiss, the plaintiffs have the burden of proving that subject matter jurisdiction exists, <u>Richmond, Fredericksburg & Potomac R. Co. v. United States</u>, 945 F.2d 765, 768 (4th Cir. 1991), and the court should grant the motion only "if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." <u>Id.</u> In reviewing such a motion, a court is "without the power to entertain claims if they are 'so attenuated and unsubstantial as to be absolutely devoid of merit.'" <u>Hagans v. Lavine</u>, 5 U.S. 528, 636-37 (1974) (citing <u>Newburyport Water Co. v. Newburyport</u>, 193 U.S. 561, 579 (1904)). A claim that is attenuated, unsubstantial or frivolous "lacks an arguable basis either in law or in fact." <u>Neitzke v. Williams</u>, 490 U.S. 319, 325 (1989).

14

COOKE & MOSES, LLC, ET AL.
v.
QSS-ENGINEERED SYSTEMS GROUP, LLC, ET. AL.
1:06CV147

## MEMORANDUM OPINION AND ORDER

## III. <u>Analysis of Defendants' 12(b)(6) Motion to Dismiss</u>

The plaintiffs' second amended complaint sets forth six separate counts against the defendants, alleging (1) a violation of RICO, (2) civil conspiracy, (3) fraud and negligent misrepresentation, (4) breach of contract to pay on a note, (5) breach of a guarantee and surety agreement, and (6) corporate veil piercing. Further, many counts include multiple claims and claims in the alternative. As the following discussion clarifies, the plaintiffs have stated successful claims under each count against some defendants but not against every defendant.

## A. RICO

The defendants contend that the plaintiffs have failed to sufficiently plead facts necessary to support civil claims under the RICO statute, 18 U.S.C. § 1964(a) and (c). Both subsections (a) and (c) of § 1964 provide civil remedies for violations of 18 U.S.C. § 1962. In pertinent part, 18 U.S.C. § 1962 provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a

## MEMORANDUM OPINION AND ORDER

              pattern of racketeering activity or collection
              of unlawful debt.

Id. at § 1962(c).

In this case, the defendants argue that the plaintiffs' RICO claims fail to properly allege (1) the existence of a separate and distinct "enterprise" from a "person," (2) the "predicate acts" necessary to constitute racketeering activity, (3) a "pattern" of racketeering activity, and (4) an injury.

### 1.    The RICO "Enterprise" Distinct From "Persons"

According to the defendants, the plaintiffs' second amended complaint identifies both the individual and corporate defendants as constituting an "enterprise."  They argue that the individual defendants cannot be both the "persons" who violated RICO while conducting an "enterprise" as well as the "enterprise" itself.

The RICO statute defines "persons" as "any individual capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).[1]  The statute then defines "enterprise" to include "any individual, partnership, corporation, association, or other legal

---

[1] The Supreme Court has acknowledged that, within the meaning of RICO, "the employee and the corporation are different 'persons' . . . ." Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 163 (2001).

## MEMORANDUM OPINION AND ORDER

entity, and any union or group of individuals associated in fact although not a legal entity." <u>Id.</u> at § 1961(4).  Further, the Fourth Circuit has stated that "an associated in fact enterprise requires proof of a 'common purpose' animating its associates, and this may be done by an 'on-going organization, formal or informal,' in which they function as a 'continuing unit.'" <u>United States v. Griffith</u>, 660 F.2d 996, 1000 (4th Cir. 1981) (quoting <u>United States v. Turkette</u>, 452 U.S. 576, 583 (1981)).

In this case, the defendants argue that a "single individual or entity cannot be both the RICO enterprise and an individual RICO defendant . . . [,which] embodies the maxim that an individual cannot associate or conspire with himself . . . ." <u>River City Markets, Inc. v. Fleming Foods West, Inc.</u>, 960 F.2d 1458, 1461 (9th Cir. 1992).  Further, they cite <u>Riverwoods Chappaqua Corp. v. Marine Midland Bank N.A.</u>, 30 F.3d 339, 344 (2nd Cir. 1995), in which the Second Circuit articulated the intracorporate conspiracy doctrine.  In that case, the Second Circuit noted that

> [b]cause a corporation can only function
> through its employees and agents, any act of
> the corporation can be viewed as an act of
> such an enterprise, and the enterprise is in
> reality no more than the defendant itself.
> Thus, where employees of a corporation

<u>MEMORANDUM OPINION AND ORDER</u>

> associate together to commit a pattern of
> predicate acts in the course of their
> employment and on behalf of the corporation,
> the employees in association with the
> corporation do not form an enterprise distinct
> from the corporation.

<u>Id.</u> (internal citations omitted).[2]

Notably, however, in <u>Cedric Kushner Promotions, Ltd. v. King</u>, 533 U.S. 158, 163 (2001), the Supreme Court distinguished between RICO claims barred by the intracorporate conspiracy doctrine and valid RICO claims. The Court reasoned that "an employee who conducts the affairs of a corporation <u>through illegal acts</u> comes within the terms of a statute that forbids any 'person' unlawfully to conduct an 'enterprise' . . . ." <u>Id.</u> at 163 (emphasis added). The Court, thus, found that participants in a corporate enterprise who act within the scope of their authority may still qualify as a distinct "person" under RICO if they "conduct[] the corporation's affairs in a RICO-forbidden way." <u>Id.</u>[3] <u>See</u> also <u>id.</u> at 164 (citing

---

[2] The court also noted that a party may establish a valid RICO claim where there is a partial overlap between the RICO person and the RICO enterprise. <u>Riverwoods</u>, 30 F.3d at 344.

[3] In <u>Cedric</u>, the Supreme Court noted, however, that the case before it did not deal with a claim in which "a corporation was the 'person' and the corporation, together with all its employees and agents, were the 'enterprise.'" 533 U.S. at 164. Although it stated that a corporation together with its employees and agents is an "oddly constructed" enterprise, the Supreme Court

COOKE & MOSES, LLC, ET AL.
v.
QSS-ENGINEERED SYSTEMS GROUP, LLC, ET. AL.
1:06CV147

## MEMORANDUM OPINION AND ORDER

<u>Nat'l Org. for Women, Inc. v. Scheidler</u>, 510 U.S. 249, 259 (1994) (finding that RICO "protects the public from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle' through which 'unlawful ... activity is committed').

Here, because they contend that the individual defendants acted within the scope of their employment and on behalf of the corporate defendants, the defendants argue that the plaintiffs' allegation that both the individual and corporate defendants constitute an "enterprise" fails to adequately identify any persons distinct from that enterprise. Accordingly, they assert that the named individual and corporate defendants constitute a single enterprise, leaving no distinct "person" to "conduct or participate, directly or indirectly in the conduct of such enterprise's affairs" under the RICO statute.

In their second amended complaint, however, the plaintiffs allege that the individual defendants sought to obtain money and property "for their own individual benefit." (Compl. at ¶¶ 66, 67).

---

remained silent as to its validity under RICO. Moreover, in <u>Riverwoods</u>, 30 F.3d at 344, the primary case upon which the defendants rely, the Second Circuit stated that RICO "does not foreclose the possibility of a corporate entity being held liable as a defendant under section 1962(c) where it associates with others to form an enterprise that is sufficiently distinct from itself."

## MEMORANDUM OPINION AND ORDER

Specifically, they allege that the defendants sought to obtain money to pay incurred debts – not for the agreed upon purpose of marketing the Iced*CAD software.

Applying the Supreme Court's analysis in <u>Cedric</u>, the plaintiffs have alleged facts sufficient to support a claim that the individual defendants, in conjunction with the corporate defendants, are separate and apart from the illegitimate enterprise through which they allegedly sought to unlawfully defraud the plaintiffs. Whether the individual defendants acted within the scope of their employment and on behalf of the corporation, consequently, is of no import because, taking the facts alleged as true and in the light most favorable to the plaintiffs, the employment was for an illegitimate end.

Moreover, the plaintiffs have pleaded facts sufficient to establish the existence of an enterprise through the "associated in fact enterprise" doctrine. As the Supreme Court held in <u>Cedric</u>, corporations may constitute "persons" within the meaning of RICO. 533 U.S. at 163. In their complaint, the plaintiffs allege that "each defendant conducted [and] participated, directly or indirectly, in the conduct of the enterprise's affairs, and

20

<u>MEMORANDUM OPINION AND ORDER</u>

conspired to do so through a pattern of racketeering activity . . . ." (Compl. ¶ 77). Pursuant to <u>United States v. Griffith</u>, 660 F.2d at 1000, therefore, because the plaintiffs have pled facts sufficient to show that each defendant person functioned as a "continuing unit" with the "common purpose" of defrauding the plaintiffs, the plaintiffs have pled facts sufficient to show a distinct "associated in fact enterprise."

**2.** **"Predicate Acts" Necessary to Constitute Racketeering Activity**

The defendants contend that the plaintiffs have alleged nothing more than garden variety fraud, and have, therefore, failed to plead facts sufficient to support a finding of the "predicate acts" necessary to constitute racketeering activity. Pursuant to 18 U.S.C. § 1961(1)(B), acts constituting racketeering activity include those chargeable under 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

To prove a violation of the mail or wire fraud statutes, the evidence must show a scheme to defraud, the intent to defraud and the use of the mails or wire. <u>Tri-County Elec. Co., Inc. v. Dean</u>, 1994 WL 653489, at *4 (N.D.W.Va. 1994). Pursuant to Fed. R. Civ.

COOKE & MOSES, LLC, ET AL.
v.
QSS-ENGINEERED SYSTEMS GROUP, LLC, ET. AL.
1:06CV147

## MEMORANDUM OPINION AND ORDER

P. 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally."  The Fourth Circuit has articulated that "the 'circumstances' required to be pled with particularity under Rule 9(b) are 'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'"  Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999) (citing 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil § 1297, at 590 (2d ed. 1990)).[4]

Notably, in Al-Abood ex rel. Al-Abood v. El-Shamari, 217 F.3d 225, 238 (4th Cir. 2000), the Fourth Circuit stated that courts should exercise some caution when a RICO claim is based solely on allegations of mail and wire fraud, because "'[i]t will be the unusual fraud that does not enlist the mails and wires in its service at least twice.'" (quoting Anderson v. Found. for

---

[4] This Court has previously reasoned that, when plaintiffs make fraud-based claims against multiple defendants, "the plaintiff must plead with specificity against each defendant . . ." and allegations made against "undifferentiated 'defendants' violate this rule." Tri-County Elec. Co., 1994 WL 653489 at *4.

## MEMORANDUM OPINION AND ORDER

<u>Advancement, Educ. and Employment of Am. Indians</u>, 155 F.3d 500, 506 (4th Cir. 1998)).  After <u>Al-Abood</u>, the Fourth Circuit has held that, where RICO claims are based on allegations of mail or wire fraud, "the plaintiff 'must have justifiably relied to his detriment on the defendant's material misrepresentation.'" <u>GE Inv. Private Placement Partners II v. Parker</u>, 247 F.3d 543, 548 (4th Cir. 2001) (quoting <u>Chisolm v. TranSouth Fin. Corp.</u>, 95 F.3d 331, 337 (4th Cir. 1996)).

The heightened pleading requirements for fraud claims prompt a careful inquiry into the plaintiffs' mail and wire fraud allegations in Count I of their second amended complaint.  There, the plaintiffs assert that "each defendant conducted, participated, directly or indirectly, in the conduct of the enterprise's affairs," and did so through schemes to defraud by use of the mails and wire. (Compl. ¶ 77).  They further allege that the defendants engaged in two separate patterns of racketeering activity, one before the loan transaction on July 13, 2004, and one after (<u>id.</u> at ¶ 78), in which they intended to "defraud and obtain property and money" from the plaintiffs. (<u>Id.</u> at ¶ 66).

## MEMORANDUM OPINION AND ORDER

Specifically, the plaintiffs first allege that, from early 2004 through the spring of 2004, Marsh and Kelly, through telephone calls and e-mails, made the following representations concerning QSS-ESG and the Iced*CAD software: (1) QSS-ESG either owned or would own the intellectual property underlying the Iced*CAD software; (2) QSS-ESG was or would be in the position to secure its obligations by pledging the intellectual property; (3) a large manufacturer had successfully implemented Iced*CAD; and (4) Iced*CAD was functional and saleable and the plaintiffs' pledged funds would be used primarily for marketing. (Compl. ¶ 32). The plaintiffs contend that, during some of these exchanges, Kelly repeatedly misrepresented that "QSS could transfer its rights to the software to QSS-ESG and that QSS-ESG could pledge them as collateral against the deal." (Id. at ¶ 54).[5] They assert that, in reliance on these representations, they ultimately made funds available to QSS-ESG and the individual defendants. (Id. at ¶ 33).

---

[5] The plaintiffs also state further counts of mail and wire fraud against defendant Kelly concerning alleged misrepresentations contained in both a Patent Application Assignment and the Business Plan Version 4.0. (Pls.' Second Amended Compl. ¶¶ 37-38).

COOKE & MOSES, LLC, ET AL.
v.
QSS-ENGINEERED SYSTEMS GROUP, LLC, ET. AL.
1:06CV147

## MEMORANDUM OPINION AND ORDER

Importantly, they note, "[a]t all times during these communications, including the false representations about the ownership status of the Iced*CAD software and its stage of development, Defendants Marsh and Kelly were acting as agents for Defendants Carlucci, Widman, Zeinstra, Moore and Stavros." (Id. at ¶ 32).

Next, the plaintiffs allege that, following the parties' loan transaction, between July 2004 and August 2005, the defendants directed a series of international wire transfers for the improper purpose of fulfilling past obligations to creditors. (Compl. ¶ 55). The plaintiffs also contend that, as part of this separate but related scheme to defraud, the defendants continued to conceal the true ownership of the Iced*CAD software. (Id. at ¶ 53). As in their description of the first scheme, the plaintiffs simply state that, "[a]t all times Defendants Kelly and Marsh made those misrepresentations on their own behalf and as agents for the remaining Defendants." (Id. at ¶ 68).

With respect to Marsh and Kelly, the plaintiffs have adequately alleged facts sufficient to support a claim under the heightened pleading requirements for averments of fraud. They have

CADE & MOSES, LLC, ET AL.

COOKE & MOSES, LLC, ET AL.
v.
QSS-ENGINEERED SYSTEMS GROUP, LLC, ET. AL.
1:06CV147

## MEMORANDUM OPINION AND ORDER

identified the persons who made the misrepresentations, the subject matter of the misrepresentations and when the specific telephone and e-mail communications pertaining to the misrepresentations occurred. They have also pled facts sufficient to infer the intent of those two defendants to defraud based on the context in which the alleged misrepresentations of occurred. Further, they have shown that they justifiably relied on the alleged misrepresentations of Marsh and Kelly to their detriment. Repeatedly in their second amended complaint, they state that they based their decision to enter into the loan transaction primarily on those misrepresentations, and consequently, lost money and property. Accordingly, the plaintiffs' allegations of mail and wire fraud against Marsh and Kelly are sufficient to show the predicate acts necessary to constitute racketeering activity under RICO.

Standing in stark contrast to these particularized allegations against Marsh and Kelly, however, are the plaintiffs' inadequate claims of wire and mail fraud against the remaining defendants. In each alleged act of mail or wire fraud, the plaintiffs strive to incorporate the remaining defendants by stating that, at all times,

26

Marsh and Kelly acted on their behalf or as their agents.[6]  While they baldly state that all of the defendants intended to defraud them, the plaintiffs have not alleged a single act or misstatement from which to infer the intent of these defendants. Importantly, they have failed to allege any statements that these defendants made, or facts relating to their respective roles in the scheme. The plaintiffs, therefore, have failed to plead sufficient facts to satisfy the heightened pleading requirements for averments of mail and wire fraud as predicate racketeering activities sufficient to support a RICO claim against the remaining defendants, Carlucci, Moore, Stavros, Zeinstra and Widman.

---

[6]In paragraph 50 of the amended complaint, for example, the plaintiffs make the following statement:

> At all times prior to the loan closing, and with respect to all actions, including the drafting of the documents entitled "Business Plan," and the conferences and discussions among Plaintiffs and Defendants Carlucci, Kelly and Marsh, Defendants Carlucci, Kelly and Marsh were acting on their own behalf and as agents for Defendants Widman, Zeinstra, Moore and Stavros.

(Compl. ¶ 50). This statement alone, however, is unclear as to Defendant Carlucci's role in any alleged act of RICO mail or wire fraud.  If taken to implicate Carlucci in those acts, the statement is contradictory to the plaintiffs' earlier assertion that, "at all times" during the early 2004 telephone and e-mail communications containing the misrepresentations, Kelly and Marsh acted on behalf of all remaining defendants.  The plaintiffs have failed, therefore, to plead facts sufficient to support a RICO claim against Carlucci.

COOKE & MOSES, LLC, ET AL.
v.
QSS-ENGINEERED SYSTEMS GROUP, LLC, ET. AL.
1:06CV147

## MEMORANDUM OPINION AND ORDER

### 3. "Pattern" of Racketeering Activity

The defendants further challenge the sufficiency of the pleadings by alleging that, in their complaint, the plaintiffs fail to show a series of related, predicate acts that constitute a "pattern" of racketeering activity. RICO stipulates that, at a minimum, a "pattern" "requires at least two acts of racketeering activity . . . " 18 U.S.C. § 1961(5), and can include "mail and wire fraud." See id. at § 1961(1)(B).

In H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 239 (1989), the Supreme Court reviewed a RICO claim and noted that the statute does not specifically define "pattern". It reasoned, however, that "a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." Id. Thus, to determine whether the plaintiffs have pleaded facts sufficient to show a "pattern" of racketeering activity against Marsh and Kelly, the Court must analyze separately whether the predicate racketeering acts of mail and wire fraud were both "related" and ". . . amount[ed] to or pose[d] a threat of continued criminal activity." See id.

COOKE & MOSES, LLC, ET AL.
v.
QSS-ENGINEERED SYSTEMS GROUP, LLC, ET. AL.
1:06CV147

## MEMORANDUM OPINION AND ORDER

Predicate acts are "related" if they "have the same or similar purposes, results, participants, victims, or methods of commission . . . ." <u>Id.</u> at 240 (citing 18 U.S.C. § 3575 <u>et. seq.</u>). Further, "'continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." <u>Id.</u> at 241. A party may demonstrate continuity over a "closed" period by identifying related acts which occurred over a "substantial period of time." <u>Id.</u> at 242.[7]

In their second amended complaint, the plaintiffs cite numerous instances in which Kelly and Marsh allegedly communicated with them – in person, over the phone and by e-mail – to fraudulently obtain money and property. (Compl. ¶¶ 66-72). Beginning in January 2004 and extending through June 2004, the plaintiffs assert that, in each of these communications, Kelly and Marsh made fraudulent misrepresentations concerning the Iced*CAD

---

[7]The Supreme Court explicitly declined to articulate a precise formula for determining when the continuity plus relationship test is satisfied. <u>H.J.</u>, 492 U.S. at 243. The Court noted, however, that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." <u>Id.</u> at 242.

## MEMORANDUM OPINION AND ORDER

software in order to obtain funding from the plaintiffs for their own individual benefit. (<u>Id.</u>).

The plaintiffs further contend that, thereafter, Defendants Kelly and Marsh engaged in a separate but related scheme to defraud them involving the misappropriation of those funds during the time period between July 2004 and August 2005. (Compl. ¶ 53). They claim that they opened a line of credit for QSS-ESG to use to market and develop the Iced*CAD software. (<u>Id.</u> at ¶ 54). They then cite a detailed account of how all the defendants, through wire transfers, allegedly used these funds for their own individual benefit rather than for the agreed upon purpose. (<u>Id.</u> at ¶ 55).

Throughout their second amended complaint, the plaintiffs consistently allege that, both before and after they initiated the line of credit, Kelly and Marsh made misrepresentations with the "similar purpose" of fraudulently obtaining money and property. When the plaintiffs' factual allegations are viewed as true, in the light most favorable to them, they are sufficient to show that the predicate acts are "related."

The plaintiffs also have alleged that these related acts occurred over a nineteen-month period of time. Although the

COOKE & MOSES, LLC, ET AL.
v.
QSS-ENGINEERED SYSTEMS GROUP, LLC, ET. AL.
1:06CV147

## MEMORANDUM OPINION AND ORDER

Supreme Court, in H.J., 492 U.S. at 242-3, found that related acts "extending over a few weeks or months" do not amount to a "substantial period of time" sufficient to show a closed period of continuity, this Court cannot say, as a matter of law at this stage of the case, that related acts occurring over a period of nineteen months could not satisfy the continuity element under a RICO pattern. The plaintiffs, therefore, have pled facts sufficient to allege a RICO "pattern."

    4. **"Injury"**

RICO provides civil remedies under 18 U.S.C. § 1964 for any person injured in person or property by a violation of § 1962. In Brandenburg v. Seidel, 859 F.2d 1179, 1189 (4th Cir. 1988) (overruled on other grounds), the Fourth Circuit reasoned that the connection between the defendants' conduct and the plaintiffs' injury requires both cause-in-fact and proximate cause. Id. at 1189. It then went on to note that, in determining proximate cause, courts may take into consideration "such factors as the foreseeability of the particular injury, the intervention of other independent causes, and the factual directness of the causal connection." Id.

COOKE & MOSES, LLC, ET AL.
v.
QSS-ENGINEERED SYSTEMS GROUP, LLC, ET. AL.
1:06CV147

## MEMORANDUM OPINION AND ORDER

The defendants contend that the plaintiffs have failed to state what caused the damages they seek.  In Count I of their second amended complaint, the plaintiffs simply state that "[p]laintiffs were injured by Defendants in their business and property by reason of these violations of 18 U.S.C. § 1962 . . . ." (Compl. ¶ 79).  Elsewhere in that complaint, however, they specifically state that the defendants engaged in a scheme to "defraud and obtain property and money <u>by means of false and fraudulent pretenses</u> as described in the Complaint." (<u>Id.</u> at ¶ 66) (emphasis added).  They also state repeatedly throughout their complaint that, but for the defendants' misrepresentations, they would not have entered into the loan transaction which resulted in the loss of their money and property. (<u>Id.</u> at ¶¶ 33, 42, and 51-52).

Accepting the plaintiffs' allegations as true, it is reasonable that the defendants could, or should, have foreseen that the plaintiffs' injuries would result from their misconduct. Therefore, the plaintiffs have stated facts sufficient to support a showing of "injury" under RICO.

## MEMORANDUM OPINION AND ORDER

Summing up the Court's findings as to the plaintiffs' RICO claims, the plaintiffs have pled facts sufficient to support RICO claims against Marsh and Kelly, but their pleadings do not sufficiently set forth RICO claims as to the remaining defendants.

## B. Fraud

In their first amended complaint, the plaintiffs alleged five distinct fraud claims. They asserted that the defendants: (1) misrepresented Iced*CAD's state of development and its revenue-producing potential; (2) misrepresented that QSS could transfer its interest in Iced*CAD to QSS-ESG, and that QSS-ESG would then pledge the software as collateral against the loan; (3) misrepresented that Kelly and Marsh would pledge their homes against the credit line and Note; (4) misrepresented that the plaintiffs' loan would be used primarily to "ramp up" marketing efforts; and (5) misrepresented PGI's role in the ownership of Iced*CAD. (Pls.' Memo. in Supp. of Mot. to Amend, p. 3). While in their second amended complaint, the plaintiffs acknowledge that the defendants initially had disclosed to them the fact that PGI owned a partial interest in the Iced*CAD software, they nevertheless allege that

<u>**MEMORANDUM OPINION AND ORDER**</u>

the defendants later misrepresented the fact of  PGI's <u>continued</u> ownership of Iced*CAD.

Under West Virginia law, the essential elements in an action for fraud include: (1) The alleged fraudulent act is that of the defendant; (2) the act was material, false and the plaintiff justifiably relied upon it; and (3) the plaintiff was injured as a result of the act. <u>Ashworth v. Albers Med., Inc.</u>, 410 F.Supp.2d 471, 477 (S.D.W.Va. 2005) (citing  <u>Lengyel v. Lint</u>, 280 S.E.2d 66, 67 (W.Va. 1981)).  The West Virginia Supreme Court has consistently held that a fraud claim "must ordinarily be predicated on an intentional misrepresentation of a past event," and not on a misrepresentation as to future events or on promissory statements. <u>Croston v. Emax Oil Co.</u>, 464 S.E.2d 728, 732 (W.Va. 1995); <u>see</u> <u>also</u> <u>Janssen v. Carolina Lumber Co.</u>, 73 S.E.2d 12, 17 (W.Va. 1952).  If the plaintiff can show that the defendant did not intend to fulfill a promise at the time it was made, however, "the nonperformance of the promise may constitute fraud." <u>Dyke v. Alleman</u>, 44 S.E.2d 587, 590 (W.Va. 1947).

As noted earlier, the Federal Rules of Civil Procedure set forth a heightened pleading standard for averments of fraud. Fed.

<u>MEMORANDUM OPINION AND ORDER</u>

R. Civ. P. 9(b). Thus, while intent may be averred generally, circumstances, including the time, place, contents of the misrepresentation and the identify of the person who made the misrepresentation, must be pled with particularity. <u>Harrison v. Westinghouse Savannah River Co.</u>, 176 F.3d 776, 784 (4th Cir. 1999) (citation omitted).

### 1. Distinct Fraud Claims

#### a. Misrepresentations Concerning Iced*CAD's Development and Revenue-Producing Potential

The plaintiffs allege that on January 8, 2004, Kelly prepared a document for them to review ("Business Plan") that outlined several issues relating to the Iced*CAD software. They contend that, in the Business Plan, Kelly stated that "Iced*CAD had been successfully implemented at a large multinational manufacturer,"[8] was an industry-leading software, was award-winning and profitable and that "multiple opportunities for revenue creation exist including . . . license revenue, services revenue, hosting services, and franchise/reseller fees." (Compl. ¶ 29). They then

---

[8] The plaintiffs state that Defendants Kelly and Marsh repeated this alleged misrepresentation during e-mail and telephone communications in early 2004.

claim that these misrepresentations were later repeated in Kelly's June 23, 2004 Business Plan 4.0. They further allege that, during a meeting at QSS-ESG's Michigan office in early 2004, Kelly showed a power point presentation listing Carlucci, Marsh and himself as "Key Team Players." (Id. at ¶ 31). The presentation also described Iced*CAD as "fully developed [and] launched." (Id.). In their response, the defendants argue that the plaintiffs have not pled this claim of fraud with the particularity required by the Federal Rules of Civil Procedure.

### b. Misrepresentations Concerning QSS-ESG's Ownership Interest In Iced*CAD

Pursuant to the factual corrections made in their second amended complaint, the plaintiffs stipulate that, in March 2004, Defendants Kelly and Marsh disclosed QSS's joint management agreement with PGI concerning the intellectual property underlying the Iced*CAD software. (Compl. ¶ 32). They allege, however, that Marsh and Kelly misrepresented that continued ownership during e-mail and telephone communications in early 2004 by "affirm[ing], repeatedly, that QSS could transfer its rights to the software to QSS-ESG and that QSS-ESG could pledge them as collateral against

36

the deal." (Id.) (emphasis added). The plaintiffs claim these misrepresentations were repeated in both Business Plans 3.0 and 4.0 (id. at ¶¶ 32, 40), in the June, 2004 Patent Application Assignment (id. at ¶¶ 37-38) and in the July, 2004 Commercial Security Agreement. (Id. at ¶¶ 46-47).

The defendants focus on the word "could," and argue that, at best, the plaintiffs have alleged a non-actionable promise not performed. Alternatively, they argue that "speculation as to something that could happen" fails even to rise to the level of a "promise not performed." (Defs.' Memo In Opp. to Mot. to Amend, p.8).

### c.   Misrepresentations Concerning Defendants Marsh and Kelly's Promises to Pledge Homes As Collateral

The plaintiffs further allege that, prior to the close of the parties' business transaction, Kelly and Marsh falsely represented that they would pledge their homes as collateral for the loan. (Compl. ¶¶ 51-52). Further, they claim Kelly falsely represented that he would personally guarantee the note. (Id. at ¶ 51). Once again, the defendants argue that this constitutes nothing more than a non-actionable promise not performed.

MEMORANDUM OPINION AND ORDER

### d. Misrepresentations Concerning Use of Plaintiffs' Loan

According to the plaintiffs, Marsh and Kelly used the telephone and e-mail in early 2004 to falsely represent that "funds secured through investment or other means would be used primarily for marketing and 'ramp up.'" (Compl. ¶ 32). They support this allegation by citing the most recent bank statement available and highlighting numerous "inappropriate" transactions made contrary to the "stated purposes for which the credit line was to be used." (Id. at ¶¶ 55, 61). Once again, the defendants argue that this claim constitutes a non-actionable promised not performed.

### 2. Analysis of Fraud Claims

The plaintiffs' second amended complaint states that, "at all times during these communications," Kelly and Marsh acted as agents for Carlucci, Widman, Zeinstra, Moore and Stavros. (Compl. ¶ 32). They also allege that Defendants John Doe 1-10 "assisted, ratified, sanctioned, approved or acquiesced to the misrepresentations . . . ." (Id. at ¶ 87). Further, they claim they relied on these alleged misrepresentations when they decided to enter into the business transaction with the defendants (id. at ¶ 42), and that they were

38

## MEMORANDUM OPINION AND ORDER

justified in doing so by virtue of the defendants' positions. (<u>Id.</u> at ¶ 85).  The plaintiffs also assert that they have been damaged in the amount of the balance and interest of the note, $666,220.71, plus costs and attorneys' fees. (<u>Id.</u> at ¶ 65).

In each distinct fraud claim, the plaintiffs have adequately identified Marsh and Kelly as those who made the alleged misrepresentations, have explained why they relied upon those statements, and have specified a dollar figure for the amount of their damages.  Even assuming that the defendants are correct in asserting that three of the plaintiffs' distinct fraud claims merely imply that there was a promise made and not performed, the plaintiffs have stated claims that have an arguable basis in law and fact.

Pursuant to West Virginia law, a valid claim for fraud can be mounted if plaintiffs can show that the defendants never intended to fulfil their alleged promise. <u>Dyke v. Alleman</u>, 44 S.E.2d at 590. Because the pleading requirements of Fed. R. Civ. P. 9(b) permit the plaintiffs to aver "intent" generally, they have sufficiently stated fraud claims that, at the least, are arguably based in both law and fact.

## MEMORANDUM OPINION AND ORDER

The defendants also assert, however, that the plaintiffs' second fraud claim concerning the ownership and transferability of the Iced*CAD software and underlying intellectual property fails even to rise to the level of a "promise not performed." They contend that the plaintiffs' allegation – that defendants stated they "could" pledge the software as collateral – amounts to mere speculation. Given the liberal standards that a plaintiff must meet to survive a motion to dismiss, however, the plaintiffs have set forth facts sufficient to support a claim that the defendants' conduct, at a minimum, amounts to a "promise not performed." As a matter of law, therefore, it cannot be said at this early stage of the case that the plaintiffs' factual allegations fail to support a legal claim.

Further, the plaintiffs have pled sufficient facts to satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b). As already noted, the Fourth Circuit has stated clearly that plaintiffs need only plead with particularity the time, place, and identity of the person making the allegedly false misrepresentation, and its contents. Harrison, 176 F.3d at 784. The plaintiffs' complaint fulfills that requirement: It discusses

COOKE & MOSES, LLC, ET AL.

v.

QSS-ENGINEERED SYSTEMS GROUP, LLC, ET. AL.

1:06CV147

## MEMORANDUM OPINION AND ORDER

at length when the alleged misrepresentations occurred, where the meetings, phone conversations and e-mail correspondences took place, which defendants made particular alleged misrepresentations, and the subject matter of those misrepresentations. Thus, assuming all facts as true, dismissal of Marsh and Kelly is unwarranted because it is not clear that "no relief could be granted against them." Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).

As to the remaining defendants, however, the plaintiffs have failed to satisfy the heightened pleading requirements for averments of fraud. It is simply not enough to allege fraud by acquiescence or agency without noting the specific acts or statements that demonstrate the defendants' acquiescence or agency relationship. Fed.R.Civ.P. 9(b). Unfortunately for them, the plaintiffs have not pled any statements or actions by Carlucci, Widman, Zeinstra, Moore, Stavros, QSS, QSS-ESG and John Does 1-10 that would support a fraud claim.[9] Accordingly, the Court

---

[9] As noted above, in paragraph 50 of their complaint, the plaintiffs claim that Carlucci acted on his own behalf and as an agent for the remaining defendants. Paragraph 32 of the plaintiffs' complaint, however, states that Marsh and Kelly made all of the alleged fraudulent misrepresentations. The plaintiffs, therefore, have not specifically identified an act of fraud committed by Carlucci as required by West Virginia law, nor have they satisfied the heightened pleading requirements of Fed. R. Civ. P. 9(b).

## MEMORANDUM OPINION AND ORDER

dismisses each distinct fraud claim against the remaining defendants.[10]

## C. Civil Conspiracy

In addition to the plaintiffs' claims of fraud and RICO, they allege that the defendants' fraudulent conduct constitutes a civil conspiracy. Under West Virginia law, a civil conspiracy is

> a combination of two or more persons[11] by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means. The cause of action is not created by the conspiracy but by the wrongful acts done by the defendants to the injury of the plaintiff.

---

[10] As an alternative to their fraud claims, the plaintiffs set forth a claim for negligent misrepresentation against the individual defendants. They claim that, by virtue of their relationship to both QSS and QSS-ESG, the individual defendants had a duty to know that the misrepresentations were false and to disclose this information to the plaintiffs. The defendants did not specifically challenge this claim in their response.

[11] The defendants argue that the plaintiffs improperly allege civil conspiracy claims in part because "a conspiracy between or among a corporation and its agents within the scope of their employment is a legal impossibility." (Defs.' Memo. In Supp. of Mot. to Dismiss, p. 20). The plaintiffs, however, have alleged that the defendants were not acting within the scope of their employment, but instead, for their own individual benefit. The plaintiffs have, therefore, alleged facts sufficient to show that QSS and QSS-ESG constitute "persons" separate and apart from the individual defendants as required by West Virginia law.

## MEMORANDUM OPINION AND ORDER

Dixon v. American Indus. Leasing Co., 253 S.E.2d 150, 152 (W.Va. 1979). Essentially, a civil conspiracy is a "combination to commit a tort." State ex rel. Myers v. Wood, 175 S.E.2d 637, 645 (W.Va. 1970).

To state an actionable claim for a civil conspiracy, the plaintiffs must prove that the defendants actually committed some wrongful act since it is not the "conspiracy" itself that gives rise to the action. Hays v. Bankers Trust Co. of California, 46 F.Supp.2d 490, 497 (S.D.W.Va. 1999); see also, Dixon v. American Industrial Leasing Co., 253 S.E.2d 150, Syl. Pt. 1 (W.Va. 1979)("In order for civil conspiracy to be actionable it must be proved that the defendants have committed some wrongful act or have committed a lawful act in an unlawful manner to the injury of the plaintiff[.]"). Additionally, individuals who have conspired to orchestrate or carry out a fraudulent scheme or plan may be liable for their conduct. Hays, 46 F.Supp.2d at 497; see also, Kessel v. Leavitt, 511 S.E.2d 720, 754 (W.Va. 1998)(noting that "one who, with knowledge of the facts, assists another in the perpetration of a fraud is equally guilty") (citation omitted).

43

## MEMORANDUM OPINION AND ORDER

This Court has already found that the plaintiffs have met the heightened pleading requirements of Fed.R.Cr.P. 9(b) and have alleged valid fraud and RICO claims against defendants Kelly and Marsh. Further, throughout their second amended complaint, they have alleged that, at all times, Kelly and Marsh acted on behalf of the remaining named defendants or as their agents. Thus, the plaintiffs allege that those defendants participated in a conspiracy to defraud the plaintiffs either through their knowledge of the fraudulent acts or their acceptance of benefits derived from those acts. Because under West Virginia law a civil conspiracy merely requires defendants to assist with and have knowledge of an underlying wrongful act in order to be held liable as conspirators, Kessel v. Leavitt, 511 S.E.2d at 754, and because the plaintiffs have alleged that all named defendants took part in a scheme to defraud the plaintiffs through, *inter alia*, "the operation and control of QSS and QSS-ESG," (Compl. ¶ 67), the plaintiffs' civil conspiracy claims survive as to each individual defendant.

COOKE & MOSES, LLC, ET AL.
v.
QSS-ENGINEERED SYSTEMS GROUP, LLC, ET. AL.
1:06CV147

## MEMORANDUM OPINION AND ORDER

## D. Defendant QSS-ESG's Breach of Contract to Pay on the Note

On July 13, 2004, QSS-ESG and C&M, as principal obligors, signed a Note with Freedom Bank for a $750,000 loan. The plaintiffs allege that the defendants defaulted on the note and that, consequently, they had to purchase the note from Freedom Bank. They argue that the defendants' breach proximately caused them financial injury and that they are entitled to the amount owed on the note, plus interest and costs. The defendants, however, contend that the plaintiffs have no standing to bring this claim by virtue of their own conduct and involvement.

Pursuant to W.Va. Code § 46-3-116(a), two persons who are co-makers on an instrument are jointly and severally liable and are subject to an action for contribution. Moreover, the West Virginia Supreme Court of Appeals has stated that "[i]f one co-obligor is required to pay the entire obligation, he may seek contribution or reimbursement from his co-obligor for fifty per centum of the amount paid." Newton v. Dailey, 280 S.E.2d 91, 94 (W.Va. 1981). The plaintiffs also may be entitled to disproportionate contribution "if it can be shown that . . . one or more of the co-obligors have received a disproportionate benefit from the

## MEMORANDUM OPINION AND ORDER

transaction . . . ." <u>Rahall v. Tweel</u>, 411 S.E.2d 461, 464 (W.Va. 1991).

In their response to the defendants' motion to dismiss, the plaintiffs argue that they have alleged facts sufficient to support this claim regardless of whether it is rooted in a breach of contract or the right to contribution. Because on the face of their complaint (compl. ¶ 99) the plaintiffs have identified both QSS-ESG and C&M as "principal <u>obligors</u>" on the note, the proper inquiry is whether the plaintiffs have stated a valid claim for contribution under West Virginia law.

In their respective responses, the parties disagree about the facts surrounding the defendants' alleged default. The defendants argue that the plaintiffs controlled QSS-ESG's daily operations at the time of the alleged breach and, therefore, caused QSS-ESG to default. (Defs.' Memo, p. 23). By contrast, the plaintiffs allege that, through March, 2006, Carlucci acted as a QSS-ESG officer and controlled its daily operations. (Pls.' Resp., pp. 17-18). They further allege that, when Freedom Bank demanded payment on the note in March, 2006, control of QSS-ESG was inconsequential; "[t]he disbursements all happened before Defendant Kelly's resignation .

## MEMORANDUM OPINION AND ORDER

. . and before C&M subsequently came to discover the misrepresentations, abuses and malfeasance that prompted this lawsuit." (<u>Id.</u> at p. 18).

When viewed in the light most favorable to them, the facts pled by the plaintiffs, if ultimately proven to be true, would support a finding of joint and several liability on the note between the parties, thereby entitling them to contribution from the defendants. Further, because they have alleged that the purpose of the loan was "primarily [to] market[] and 'ramp up'" QSS-ESG's Iced*CAD software (compl. ¶ 32), the plaintiffs have pled facts sufficient to show that they may be entitled to "disproportionate benefits" in the amount of the balance of the note plus interests and costs. The Court, therefore, denies the defendants' motion to dismiss the plaintiffs' claim concerning Defendant QSS-ESG's alleged default on the note, and interprets that claim as one for contribution under West Virginia state law.[12]

---

[12] In the alternative, the plaintiffs argue that they have pled facts sufficient to support a claim that defendants are responsible for the full amount of the Note pursuant to the West Virginia statute regarding an "accommodation party." <u>See</u> W.Va. Code § 46-3-419(a). The Court, however, need not fully analyze this issue in light of its finding that the plaintiffs have stated a valid claim for contribution.

COOKE & MOSES, LLC, ET AL.

v.

QSS-ENGINEERED SYSTEMS GROUP, LLC, ET. AL.

1:06CV147

## MEMORANDUM OPINION AND ORDER

### E. Defendant Marsh's Breach of the Guaranty and Surety Agreement

Prior to the close of the parties' business transaction, Cooke and Moses and Marsh entered into guaranty agreements, pledging obligations under the note. Because QSS-ESG and C&M were the principal obligors on the note, the plaintiffs state that Cooke, Moses and Marsh were, therefore, secondary obligors. The plaintiffs allege that Defendant Marsh is the Note's "principal surety" "by virtue of [his] fraudulent acts and material misrepresentations." (Id. at ¶ 102). Consequently, they claim that Marsh is liable for the Note's balance, plus interest and costs. The defendants, however, argue that the parties did not designate a principal surety and subsureties in their agreement, and further, that an equitable "subsuretyship" is not a legally cognizable remedy in West Virginia.

In Lowe v. Albertazzie, 516 S.E.2d 258, 264 (W.Va. 1999), the West Virginia Supreme Court of Appeals specifically adopted the doctrine of subsurety, finding that a "subsuretyship" may exist "[w]hen there is more than one secondary obligor with respect to the same underlying obligation" (citing The Restatement (Third) of Suretyship and Guaranty §§ 53, 55(1996)). Courts may invoke a

## MEMORANDUM OPINION AND ORDER

subsuretyship as an equitable remedy (1) in the absence of an agreement between the secondary obligors, (2) when the agreement is ambiguous, or (3) when a plaintiff "claims fraud, mistake, or material misrepresentations in the execution of such agreement." Id. at 267. Notably, the circumstances demonstrating an equitable subsuretyship must show that the "principal surety," rather than the "subsurety," should bear the cost of performance, and a party may prove those circumstances through extrinsic evidence. Id. at 264, 67.

Here, the defendants correctly note that no agreement existed between the parties as to primary or secondary guarantors. As discussed above, however, the plaintiffs have alleged numerous facts in their second amended complaint in support of a claim that the parties executed a note in reliance on Marsh and Kelly's allegedly fraudulent misrepresentations. Pursuant to the analysis in Albertazzie, therefore, the plaintiffs may claim fraud, supported by extrinsic evidence, to prove the circumstances that demonstrate that Marsh is the principal subsurety on the note. 516 S.E.2d at 264. They have pled facts, which if taken as true, are sufficient to prove the circumstances demonstrating an equitable

## MEMORANDUM OPINION AND ORDER

subsuretyship under West Virginia law. Accordingly, the plaintiffs' pleadings are sufficient to support this claim against Marsh.

**F. Joint Venture and Piercing the Corporate Veil**

In Count VI of their second amended complaint, the plaintiffs contend that the Court should pierce the corporate veil and hold the individual defendants liable for the debts of QSS and QSS-ESG. Under West Virginia law, corporations and their shareholders are presumed to be separate legal entities and a shareholder's liability is usually limited to his capital investments. Laya v. Erin Homes, Inc., 352 S.E.2d 93, 97 (W.Va. 1986). See also S. Electrical Supply Co. v. Raleigh County Nat'l Bank, 320 S.E.2d 515, 516 (W.Va. 1984). In exceptional circumstances, however, a court may "pierce the corporate veil" and remove the barrier to shareholders' personal liability. Laya, 352 S.E.2d at 97. Exceptional circumstances may arise when maintaining the legal fiction of a separate corporate entity distinct from its shareholders "would produce injustices or inequitable consequences." Id. at 98.

COOKE & MOSES, LLC, ET AL.
v.
QSS-ENGINEERED SYSTEMS GROUP, LLC, ET. AL.
1:06CV147

## MEMORANDUM OPINION AND ORDER

In cases in which a party alleges that a corporate defendant breached a contractual obligation, courts apply a two-part test to determine whether to hold those shareholders who actively participated in the operation of the business personally liable for the breach:

> (1) [T]here must be such <u>unity of interest</u> and ownership that the separate personalities of the corporation and of the individual shareholder(s) no longer exist (a disregard of formalities requirement) and (2) an inequitable result would occur if the acts are treated as those of the corporation alone (a fairness requirement).[13]

<u>Laya</u>, 352 S.E.2d at 99 (emphasis added). West Virginia's Supreme Court has enumerated a noncomprehensive list of factors that, when reviewed under a "totality of the circumstances" analysis, demonstrate a "unity of interest." <u>Id.</u> at 98-99. Pertinent to the factual allegations at issue here, some of the factors include "commingling of funds and other assets of the corporation with those of the individual shareholders," "diversion of the

---

[13] Although some commentators have suggested that a third prong exists as to creditors who are capable of protecting themselves by conducting an investigation of the corporate entity's credit, the general presumption is that "the party dealing with the corporation did not assume the risk of grossly inadequate capitalization." <u>Laya</u>, 352 S.E.2d at 100; <u>see also</u> <u>Iron City Sand & Gravel Div. of McDonough Co. v. West Fork Towing Corp.</u>, 298 F.Supp. 1091, 1099 (N.D.W.Va. 1969) (rev'd on other grounds).

## MEMORANDUM OPINION AND ORDER

corporation's funds or assets to noncorporate uses (to the personal uses of the corporation's shareholders)," "identity of the directors and officers of two entities who are responsible for supervision and management (a partnership or sole proprietorship and a corporation owned and managed by the same parties) " and "failure to adequately capitalize a corporation for the reasonable risks of the corporate undertaking." Id. at 98. In expressing its hesitancy to determine whether to pierce the corporate veil on a dispositive motion, the Supreme Court noted that "the propriety of piercing the corporate veil usually involves numerous questions of fact for the trier of the facts to determine upon all of the evidence." Id. at 102.

In this case, the plaintiffs contend that the defendants operated QSS-ESG as QSS's alter ego or as a single venture. They then allege numerous facts in support of that allegation, including that (1) Kelly, Widman and Zeinstra each have, at various times, been the president of QSS; (2) Moore and Stavros each have, at various times, been the secretary and treasurer of QSS; (4) Kelly, Widman, Zeinstra, Moore, and Stavros were the original members of QSS-ESG, and they have supervisory and managerial control over both

MEMORANDUM OPINION AND ORDER

QSS and QSS-ESG; (5) Marsh is or was an officer and or member of QSS-ESG and carried out many of its operations; (6) QSS-ESG used the name "QSSolutions" (otherwise known as "QSS") to market its materials; (7) QSS and QSS-ESG have periodically used the same or similar address; (8) both QSS and QSS-ESG have the same registered agent; (9) and QSS was under-capitalized. (Compl. ¶¶ 107-21).

When reviewed under a "totality of the evidence" analysis at this early stage of the litigation, the plaintiffs' factual allegations appear to fall squarely within several of the factors pertinent to the "unity of interest" prong of the applicable test. Notably, many of them relate to the "undercapitalization" and "identity of the directors and officers" factors. The plaintiffs, therefore, have pled facts that, if proven, would satisfy the first prong of the test – that there is a unity of interest between QSS-ESG and its individual shareholders.

The plaintiffs also have consistently alleged throughout their second amended complaint that the defendants facilitated their fraudulent misconduct through the use of QSS-ESG. Additionally, the very foundation underlying each of the plaintiffs' claims hinges on QSS-ESG's alleged default on its obligation under the

COOKE & MOSES, LLC, ET AL.
v.
QSS-ENGINEERED SYSTEMS GROUP, LLC, ET. AL.
1:06CV147

## MEMORANDUM OPINION AND ORDER

note.  Further, the plaintiffs allege that the defendants, through QSS-ESG, have depleted the funds made available through the plaintiffs' loan.  When these facts are construed in the light most favorable to the plaintiffs, the allegations in the plaintiffs' second amended complaint satisfy the second prong of the test – that, if the corporate veil is not pierced, the plaintiffs may be inequitably deprived of funds due to the fraudulent acts of the individual defendants who actively participated in the operation of the business.

Although the plaintiffs have pled facts sufficient to satisfy both prongs of the test necessary to support a piercing of the corporate veil claim, they have not alleged facts sufficient to hold each individual defendant personally liable under this theory of West Virginia law.  The second amended complaint does not allege sufficient facts to establish how Carlucci and John Does 1-10 actively participated in the operation and control of the business. It merely states that Carlucci was either an agent or an employee of QSS-ESG and acted as a project manager, and that John Does 1-10 are as yet unidentified.  Those allegations are insufficient to support a finding that Carlucci and John Does 1-10 actively

54

MEMORANDUM OPINION AND ORDER

participated in the operation of QSS-ESG so as to be personally liable for QSS-ESG's alleged breach of contract.[14]

IV. **Analysis of Defendants' 12(b)(1) Motion to Dismiss**

The defendants urge the Court to dismiss the plaintiffs' second amended complaint for lack of subject matter jurisdiction because the plaintiffs' claims lack factual bases and are frivolous. In light of the conclusions in this Memorandum Opinion, however, this argument is meritless. Precisely because the Court has denied the defendants' Rule 12(b)(6) motion to dismiss the plaintiffs' claims, it is unable to find that those claims are so "attenuated and unsubstantial as to be absolutely devoid of merit.'" Hagans v. Lavine, 5 U.S. 528, 636-37 (1974). Accordingly, the Court denies the defendants' 12(b)(1) motion to dismiss the plaintiffs' second amended complaint for lack of subject matter jurisdiction.

---

[14] Alternatively, the plaintiffs allege that the nature of the relationship between QSS-ESG and QSS was one of joint venturers or partners, and that QSS-ESG's acts are, therefore, imputed to QSS. They, however, do not provide a significant analysis of this claim, nor do they offer facts apart from those set forth in support of their "piercing the corporate veil" claim.

## MEMORANDUM OPINION AND ORDER

### V. Conclusion

For the foregoing reasons, the Court:

(1) **DENIES** the defendants' motion to dismiss Count I (RICO claims) as to Marsh and Kelly and **GRANTS** the motion to dismiss as to the remaining defendants;

(2) **DENIES** the defendants' motion to dismiss Count II (civil conspiracy claim) against all defendants;

(3) **DENIES** the defendants' motions to dismiss Count III (four distinct fraud claims) as to Marsh and Kelly and **GRANTS** the motion as to the remaining defendants.

(4) **DENIES** the defendants' motions to dismiss Count IV (claim against QSS-ESG for breach of contract), and interprets this claim as one for contribution;

(5) **DENIES** the defendants' motions to dismiss Count V (claim against Marsh for breach of guaranty agreement);

(6) **DENIES** the defendants' motion to dismiss Count VI (piercing the corporate veil claim against the individual defendants) as to Marsh, Kelly, Moore, Stravos, Widman, and

## MEMORANDUM OPINION AND ORDER

Zeinstra and **GRANTS** their motion as to Carlucci and John Does 1-10.

It is **SO ORDERED.**

The Clerk is directed to transmit copies of this Order to counsel of record.

DATED: August 28, 2007


/s/ Irene M. Keeley

IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE